ELLIS, Judge
(dissenting).
The defendants have appealed from a judgment awarding plaintiff compensation at the rate of $31.20 per week for total disability not to exceed 400 weeks, with a rejection of plaintiff’s demands for interest, penalties and attorneys fees.
Realizing the futility of a dissent based upon facts which my esteemed brethren, as well as the esteemed District Judge, have found to be different, as a basis of their judgment, nevertheless, I am obligated by the duties and responsibilities placed upon me as a Judge to respectfully dissent when I conscientiously believe an error of law or fact has been committed.
In view of the Judicial rule of affirmance of a lower court Judgment upon the basis that the latter saw, heard and observed the witnesses, unless the record shows manifest error, which has now judicially in such cases practically become what might be termed "manifest destiny” as to what the Judgment of the appellate court must and shall be in such cases, it is important therefore to call attention to the fact that a lower court in rendering a judgment did so from memory of the testimony and witnesses and prior to the filing of the cold, impartial and unalterable facts as testified by the witnesses and contents of the exhibits, introduced in evidence and which it would be practically impossible for anyone to accurately record and fully embrace within their minds. I feel that where the lower court has not had the benefit of the transcript and the exhibits which are most material in this case, prior to judgment, that, at least, there should be no “manifest destiny” doctrine applied to a consideration of the proper judgment by an appellate court. We recently considered an appeal in which the lower court stated in effect in his written reasons that when he saw, ob *607 served and heard the witnesses, he was definitely of one opinion but that when he later read the cold facts as testified to by these same witnesses he completely changed his opinion. Thus the importance of the transcript and actual written testimony of the witnesses and contents of the exhibits prior to judgment.
The importance of the written record is excellently stated by Judge Regan of the Orleans Court of Appeal in Owens v. Felder, 35 So.2d 671, at page 672 as follows :
“We are reluctant to reverse the finding of a trial court based primarily on questions of fact, but in a case, such as we are presently analyzing, it is a self evident principle that it is occasionally easier to perceive fallacies and inconsistencies contained in the record by a comparison of the various portions of the transcribed record with other pertinent portions than it is to accurately observe and catalogue them while listening to the oral evidence of the various witnesses who testified during the course of the trial.”
Having unburdened my mind of the main reason for believing that the judicial doctrine of “manifest error” should play no part in a consideration of the judgment of the lower court,[1] correctness vel non and with assurance, though not needed of my continued esteem for those with whom I respectfully disagree I now proceed to outline my reasons for this dissent.
Plaintiff’s suit was filed on Feb. 11, 1958 and among other things contained an allegation that:
“Your petitioner was employed by Olinde Hardware & Supply Co. Inc. in hazardous employment in the Parish of East Baton Rouge, when on or about October 17, 1957 as he was catching heavy piece of sheet rock which his co-worker was sliding to him, his co-worker lost control of one piece of sheet rock and when he caught same, he suffered a sharp pain and received a severe trauma to his back.”
The plaintiff furnished information to the Division of Unemployment Security of the Department of Labor of the State of Louisiana, on January 20, 1958 that he had been hurt on the job with Olinde Hardware Company on October 15, 1957, he also testified in a deposition taken on April 8, 1958 that he was injured on October 15, 1957, and again in his testimony on the trial of the case on June 24, 1958. Plaintiff also, on Feb. 11, 1958, in an application for unemployment compensation signed by him made the statement: “I was hurt on the job 10-15-57 while working for Olinde Hardware Company.” Despite such evidence, it appears that the occurrence of an accident, which is denied, if any, by the answer, has been accepted as having occurred on November 15, 1957, by virtue of the fact that the plaintiff testified that the next day after the accident he went to Dr. Mosely and Dr. Mosely’s report shows that he visited him on Nov. 16, 1957 and evidently gave the date'of injury as the previous day or Nov. 15, 1957. As to the actual occurrence of the accident, plaintiff testified that he and a fellow employee were unloading sheet rock from a truck belonging to Olinde Hardware Company at a house under construction. Plaintiff stated that his fellow employee Johnny Jones was on the truck which was located about two feet from the house, and that two pieces of sheet rock which were bundled together each being Y¡ inch thick, and eight foot long and four foot high was being unloaded and plaintiff stated “He slid it too fast on me and that’s what he hurt me on.” In his deposition on the 8th of April 1958 the plaintiff testified that when the bundle of sheet rock struck' him it knocked him down on the concrete floor and at that time he told, he said, his fellow empioyee, “Johnny, I hurt me.” On the trial of the *608 case he did not mention being knocked down but stated that as a result of the two pieces of sheet rock which were in the bundle having struck him and his inability to hold them his back was injured at that time.
Johnny Jones was asked if he remembered working with the plaintiff “in either October or November, 1957 and unloading sheet rock with him?” He stated that he did and that plaintiff was the driver of the truck and when they arrived at the house under construction for delivery of the sheet rock plaintiff got inside the window of the house and he passed the bundles of sheet rock to him. This witness estimated the weight of the two pieces of sheet rock in the bundle at around “eighty, ninety or a hundred pounds, at least.” He stated that one of the bundles slipped and he was asked as a result of this what was plaintiff's reaction. He stated: “It sort of knocked him down * * *. When it slipped it sort of knocked him off balance.” Plaintiff and Jones continued to unload the sheet rock and Jones states that after they had gotten on the truck on their way back to Olinde Hardware Co. that plaintiff told him he thought he had sprained his back.
If the accident happened on Oct. 15th or around the 17th as alleged in the petition plaintiff then continued to work through Nov. 15th without any mention of any injury or accident. However, if it actually happened on Nov. 15th, which seems to have been accepted by counsel for both sides, and the lower court, although there is no apparent reason for such acceptance, it is still a fact from the record that he did not mention the occurrence to anyone at Olinde Hardware Company, when he failed to return after pay day. The office manager for the Olinde Hardware Company testified that Jones did general labor in the handling of building materials and hardware supplies, appliances, etc., drove the truck. In other words, he was a general laborer, that plaintiff’s last pay day was from the first through the fifteenth of November, 1957 and that thereafter plaintiff voluntarily terminated his employment with Olinde Hardware Company. This witness testified that their first knowledge of plaintiff’s claim was from a report dated November 20, 1957, signed by Dr. C. H. Mosely as the result of an examination by the latter upon a complaint by the plaintiff of an accident.
Dr. Mosely testified that on Nov. 16, 1957, plaintiff came to his office and he examined him and had an X ray taken of his back which showed no significant abnormality. The Doctor concluded that plaintiff had suffered an acute lumbar strain, “which did not seem very severe and I think we had estimated that he would have a rather short period of disability originally.” As a matter of fact the Doctor’s estimate of his disability was one week or until Nov. 23, 1957. Dr. Mosely saw plaintiff again on the 19th of November but observed no change in his condition and there are no testimony or questions directed along that line by counsel. Plaintiff failed to keep an appointment on the 25th of November but came back on the 26th of December, stating that his back still hurt and he was again given “something treatment.” He again returned on the 30th of December. There is no testimony as to the examinations or the results thereof on the latter two dates. Dr. Mosely finally saw plaintiff on the sixth of January, 1958 and the examination was negative for any objective symptoms. Of this examination Dr. Mosely stated: “ * * and I asked him if he could work at that time and he said that he was willing to try, but, as I previously mentioned, that he would prefer to return to some other place rather than his previous employer, and with that I discharged him to attempt work.” The record shows that he had been working rather continuously since Nov. 27th, 1957 at this time. Dr. Mosely stated that he thought plaintiff had “the usual mild back strain, that he might be disabled for perhaps a week.”
Mr. Sam Koltun, an employee of the Louisiana Division of Employment Security, testified that the plaintiff first filed ap *609 plication for work on Nov. 26, 1957. At that time he did not file a claim for unemployment benefits. On the next day, Nov. 27, 1957, the plaintiff was referred to a job by the local office with W. R, Aldrich, as a construction laborer. No representative of W. R. Aldrich was placed on the stand to show the manner or duration of plaintiff’s work, however the work record from the Division of Labor of the State of Louisiana next shows that he was given a job on December 11, 1957 as a laborer with David Mannino Company. The record of the Department of Labor as to this aspect of the case shows that plaintiff was referred to 26 different jobs between Nov. 27, 1957 and April 23, 1958. Plaintiff worked every day on which he could obtain employment. Apparently plaintiff was constantly employed from the 27th of Nov. 1957 to April 23, 1958 and from then on until the date of the trial at which time he was still working.
The record shows that on Jan. 20, 1958, plaintiff initiated a claim for unemployment insurance and at that time he told the claims interviewer that he last worked for Olinde Hardware on Oct. 15, 1957, and he left that job or became unemployed because he was hurt on the job. This was the first occasion upon which plaintiff even intimated to the Division of Unemployment that he had been injured. Mr. Koltun explained that when this information was given to their department it became necessary for them then to require of the claimant that he furnish evidence of his ability to work in order to be eligible to file such a claim. As a result of their request, plaintiff then got the certificate from Dr. Mosely on January 6, 1958, which stated “Please permit Polien Jones to return to duty.” The Department accepted this certificate from Dr. Mosely as evidence of plaintiff’s physical ability to work. Mr. Koltun explained that when an applicant filed such a claim there is a classification questionnaire which is given to each claimant which they are to fill out in order that the Department might classify them as to whether or not there might be an issue in connection with their claim. The plaintiff was given such a classification questionnaire and brought it back apparently on Jan. 21, 1958, which was the date opposite plaintiff’s signature. On this questionnaire named as his last employer Olinde Hardware Company and the last day worked as December 20, 1957 and the length of time which he worked for his last employer as four years as a truck driver. There is no explanation in the record of his stating that the last day which he worked for Olinde Hardware was Dec. 20, 1957, for the record is positive that he only worked through Nov. 15, 1957. Furthermore he was not employed four years but for approximately two years. He was asked in this questionnaire “Why are you unemployed” and answered “I had an accident on job.” He was also asked “When do you expect to return to work” and answered, “When I get one.” Mr. Koltun was asked the following question: “So from the record that you had on Polien Jones, from his statement and the statement of his doctor, there was no reason why he could not be sent on job, is that correct?” He answered: “No, there never was any question about that.”
Plaintiff’s last employer and the one for whom he was working at the time of the trial was “Givens and Bankston, Realtors,” and he was employed as a laborer digging foundations for houses under construction, cleaning up around the job, and “general labor work.” Plaintiff was described by Mr. Howard Bamber, a foreman of Givens and Bankston, “good worker, * * * a hard worker.” This witness stated, however that the plaintiff complained of back ailments and that he had seen him take pills, “Capsules rather.” This capsule taking and complaints were limited by J. M. Bamber, brother of Howard Bamber and supervisor for Givens and Bankston as being “the last two weeks (prior to trial) is when you have noticed he had some difficulty?” to which he answered, “Yes, sir.” He was described by both Bambers as a willing worker and didn’t apparently *610 seem to have any difficulty in doing the particular work assigned to him and Howard Bamber described him as being in his opinion about the best laborer he had hired in that area. He described the digging of a foundation as being about 16 inches wide and 12 or 14 inches deep all around the house, which is usually about 35 by 40 feet and this required the use of a shovel. He also remembered that plaintiff assisted in the pouring of the concrete foundation in that he helped drag a 2 x 4 across the surface of the form to level the concrete. He described it, however, as hard work, and as requiring stooping. It would be hard to imagine any laborer receiving a higher recommendation as a hard, willing and competent worker than given the plaintiff by J. M. Bamber. He stated: “He is a good working man. He is about the best I have ever worked for a colored guy, and a laborer.” He never mentioned to this witness any back injury or made any complaint other than approximately two weeks before the trial. This witness stated that the plaintiff never missed any time on account of sickness and only missed eight or ten days which was due to “not having any work for him.”
Also testifying on behalf of the defendant was Charles Heyward Norton of the C. H. Norton Co. by whom plaintiff was employed from Feb. 16, 1958 to March 5, 1958, as a common laborer at $1.25 an hour. He described plaintiff’s work as being satisfactory and the latter as a good worker and a hard worker and he never complained to him of any difficulty with his back. Plaintiff’s termination was the result of a lay off.
Neither plaintiff nor defendant produced any witness as to the plaintiff’s work record with any of the other 24 employees with whom he was employed from Nov. 27, 1957, to the date of trial. Some of the plaintiff’s employment during this time would be for a half day or one day or two days. The only other material testimony in this case is that of Dr. Campanella who examined the plaintiff first on Feb. 27, 1958, after he had filed a suit for compensation and again on May 27, 1958. On the first examination plaintiff gave Dr. Campanella a history of having “injured his back while unloading sheet rock and felt a pull in his back, and that it had given him trouble ever since.” He examined him and found no objective symptoms although he described the soreness in the lumbo-sacral area as an objective symptom, it is really not because it depends completely upon the statement or actions of the patient, unless there are objective symptoms such as muscle spasms. As a result of this examination Dr. Campanella stated that he felt "He (plaintiff) probably had an acute strain of the lumbar sacral joint and perhaps pull or so-called strain of the muscles on each side of the joint, the so-called para-vertebral muscle mass.” He felt that the muscles were not relaxed enough at the time of this examination and that they needed a little stretching but that plaintiff “had made a very nice recovery.” On the second examination of May 27, 1958, at which time he had been working as a laborer doing hard work for Givens and Bankston for slightly more than one month — since April 20, 1958, plaintiff stated to Dr. Campanella “that he was unable to stoop down because it makes the pain worse in the lumbo-sacral joint.” Dr. Campanella on this examination found tenderness of the lumbo-sacral joint and tenderness just lateral or to each side of the lumbo-sacral joint, with muscle spasm on that side; “something which he did not have before.” It was Dr. Campanella’s opinion that on this date plaintiff was still suffering from a mild lumbo-sacral joint strain “and again strain of the back muscles, but I felt that he should continue working with his back in order to stretch these muscles and restore it to a normal tone. They were still tight, and I felt that stretching it would help him, particularly work. I know of no better way of stretching a muscle.” It also appeared that plaintiff had told Dr. Campanella that he had tried to work as a *611 carpenter helper and he couldn’t. As a matter of fact the record shows that he had worked continuously for 26 different employers from Nov. 27, 1957, to the date of the trial and that he had done hard labor without complaints. It is more than likely that any muscle spasm which was present in his back on the 27th of May 1957 was due to a recent strain.
On cross-examination Dr. Campanella frankly stated that it was his opinion that plaintiff was and should be able to return to work, although he might have some pain. It is self-evident that Dr. Campanella did not think the pain would be sufficient to deter plaintiff in his work for he certainly would not have stated that following his examination of May 27, 1958, that he felt plaintiff was able to return to work to perform the duties of a laborer. He stated in answer to question: “Did you feel that he had suffered any permanent disability, or exhibited any signs of any permanent disability?” A. “I felt that he still had a residual disability which I thought should be in the region of approximately five to ten per cent, but I felt that that was temporary and did not feel that it would be a permanent type of pain.” In another part of his testimony Dr. Campanella stated: “I felt that he still had approximately a five to ten per cent disability which is pretty hard to actually compute, but that is a minimal type of disability and I felt that that was of a temporary nature and would improve with time and use.” (Emphasis added.) Dr. Campanella’s testimony also was based somewhat on what plaintiff told him that as of May 27, 1958, he had changed his occupation from that of a carpenter’s helper to a janitor, “a clean up man”, and that he was not able to do heavy work. This is in direct conflict with his work record and the testimony of his former employers.
This Court was also shown the moving pictures which were taken when the plaintiff knew that they were being taken. To me they show the plaintiff rolling a loaded wheelbarrow, stooping and walking without any apparent difficulty.
In view of the plaintiff’s poor memory as revealed by the transcript of evidence, his unimpressive account of his alleged accident which apparently caused him practically no pain or suffering, and which if it occurred at all, by the preponderance of the evidence from his own lips as testified to by him and as evidently told to his attorney, and to the Employment bureau, was on the 15th of October rather than November 15th, his excellent record of doing hard manual labor without complaint, subsequent to the alleged accident, other than two weeks before the trial, his voluntarily quitting work without notice or complaint of an accident, the medical testimony and particularly that of Dr. Campanella which was based upon erroneous information supplied by plaintiff, that the latter’s disability at most was temporary and he should return to work, I am of the opinion that he has utterly failed to bear the burden of proof 'required and that the judgment should be reversed and his suit dismissed.
I respectfully dissent.
Rehearing denied; ELLIS, J., dissenting.

. Case tried June 24, 1958; Judgment rendered, oral reasons June 26, 1958; read and signed June' 27, 1958; Testimony transcribed and filed July 23, 1958.